IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DR. LARRY CAMP, *et al.*,               )
                                        )
            Plaintiffs,                 )
                                        )
    v.                                  )    CASE NO. 2:08-CV-227-WKW [WO]
                                        )
CORRECTIONAL MEDICAL SERVICES, )
INC., *et al.*,                         )
                                        )
            Defendants.                 )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Dr. Larry Camp ("Camp") and Sabrina Martindale ("Martindale") (collectively "Plaintiffs") bring this action against Correctional Medical Services, Inc. ("CMS"), Richard F. Allen ("Allen"), Ruth Naglich ("Naglich"), and Laura Ferrell ("Ferrell"),[1] alleging First Amendment violations under 42 U.S.C. § 1983 and various state law claims. (Am. Compl. (Doc. # 37).) This cause is before the court on Plaintiffs' motion for partial summary judgment on Camp's § 1983 claims (Doc. # 69), CMS's motion for summary judgment on all claims (Docs. # 70, 71), and Allen, Naglich, and Ferrell's (collectively "the ADOC defendants") motion for summary judgment on all claims (Docs. # 73, 74). After careful consideration of counsels' briefs, the relevant law, and the record as a whole, the court finds that Camp's motion is due to be denied, CMS's motion is due to be granted, and the ADOC defendants' motion is due to be granted in part and denied in part.

---

[1] Plaintiffs have sued Allen, Naglich, and Ferrell in their individual and official capacities. (Am. Compl.)

# I. JURISDICTION AND VENUE

The parties do not dispute subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367; nor do the parties contest personal jurisdiction or venue. There are adequate allegations in support of each.

# II. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of CMS's failure to hire Camp and Martindale to the positions of dentist and dental assistant, respectively, at the Limestone Correctional Facility ("Limestone Facility"). Plaintiffs allege that the hiring decisions were in retaliation for prior complaints made by Plaintiffs concerning a supervisor's alleged "improper and unethical" practices. The evidentiary submissions of the parties establish the following facts.

## A.   **Factual Background**

### 1.   *Camp's and Martindale's Previous Employment with NaphCare and PHS*

The Alabama Department of Corrections ("ADOC") contracts with private companies to provide medical and dental services to the state's inmate population. In July 2002, one such company, NaphCare, Inc. ("NaphCare"), hired Camp to provide dental services to inmates at the Limestone and St. Clair Correctional facilities in Alabama. (Camp. Aff. ¶ 5, Feb. 4, 2009 ("Camp Aff. I") (Ex. A to Pls.' Summ. J. Br.).) In February 2003, NaphCare hired Martindale to work as a dental assistant at the Limestone Facility. (Martindale Aff. ¶ 3, Feb. 5, 2009 ("Martindale Aff. I") (Ex. B to Pls.' Summ. J. Br.).) Upon replacing NaphCare as the state's contractor in November 2003, Prison Health Services, Inc. ("PHS")

hired both Camp and Martindale to continue providing dental services at the Limestone Facility.  (Camp Aff. I ¶ 5; Martindale Aff. I ¶ 3.)[2]

While employed by PHS at the Limestone Facility, Camp and Martindale independently filed complaints against the Director of Dental Services, Dr. David Michael West ("West").   Camp sent a letter to PHS's Regional Medical Director and the Commissioner of the ADOC on December 11, 2003.  (Letter from Camp to Dr. Will Mosier, Dec. 11, 2003 ("Camp letter") (Ex. 1 to Camp Aff. I).)  He sent a formal complaint to the Board of Dental Examiners of Alabama ("Dental Board") on December 17, 2003 (Complaint from Camp to the Dental Board, Dec. 17, 2003.  ("Camp complaint") (Ex. 2 to  Camp. Aff. I).)  Camp's letter and complaint stated that West used "brutal and painful" methods for the purpose of reducing demand for dental services, that West did not properly sterilize equipment, and that West failed to maintain adequate supplies for the site.  (Camp letter; Camp complaint.)  Martindale's complaint – addressed to the Dental Board on January 2, 2004 – discussed a specific incident during which West allegedly insisted upon using unsterilized equipment.  (Complaint from Martindale to the Dental Board, Jan. 2, 2004 ("Martindale complaint") (Ex. 1 to Martindale Aff. I).)  West was ultimately sanctioned by

---

[2] It is unclear whether Camp and Martindale worked as employees of PHS, or as independent contractors of PHS.  Although the evidence shows that Camp would have been an independent contractor had he been retained by CMS (Meeker Aff. ¶ 6 (Ex. A to CMS Summ. J. Br.); Ray Dep. 12 (Ex. F to CMS Summ. J. Br.)), there is no evidence establishing that Camp and/or Martindale were independent contractors when they worked for PHS.  Both Camp's and Martindale's affidavits state that they were employees.  (Camp Aff. ¶ 3, Mar. 9, 2009 ("Camp Aff. II") (Ex. D to Pls.' Resp. Br.); Martindale Aff. ¶ 3, Mar. 10, 2009 ("Martindale Aff. II") (Ex. C to Pls.' Resp. Br.).)  Thus, the court proceeds under the assumption that both Camp and Martindale were employees of PHS when the alleged protected speech occurred.

the Dental Board for "fail[ure] to meet or comply with the current recommendations of the Centers for Disease Control and Prevention's Recommended Infection-Control Practices for Dentistry." (Dental Board Am. Order, Sept. 8, 2005 (Ex. 4 to Camp Aff. I).)

Less than one month after filing the complaints, Ferrell, who was at that time a Regional Vice President for PHS (Martindale Dep. 78 (Ex. J to CMS Summ. J. Br.)), notified Camp that his job had been terminated. (Camp Aff. I ¶ 11.) Ferrell claims that the termination was based on Camp's failure to abide by company policy and failure to work the requisite hours. (*See* West Dep. 203 (Ex. 11 to ADOC Defs.' Summ. J. Br. (stating that West reported to Ferrell that Camp was not fulfilling his time obligations).) Ferrell was, however, aware of Camp's complaints at the time. When asked whether she "didn't like" that Camp wrote a letter to the ADOC about violations of clinical procedure, Ferrell responded: "I don't like that as a regional vice president that I was shown a letter of complaints in front of my client." (Ferrell Dep. 219 (Ex. J to Pls.' Summ. J. Br.).) Camp claims that Ferrell told him that the reason for his termination was his "failure to follow policies and procedures and not following [the] chain of command." (Camp Dep. 212, Nov. 21, 2008 ("Camp Dep. I") (Ex. H to CMS Summ. J. Br.).)

On December 13, 2004, Ferrell discharged Martindale for allegedly falsifying her time records. (Martindale Dep. 241.)

4

### 2. *Camp's Application with CMS*

On November 1, 2007, CMS contracted with the ADOC to provide healthcare services for the Alabama prison system. (Linton Aff. ¶ 3 (Ex. B to CMS Summ. J. Br.).) The ADOC-CMS contract grants the ADOC the authority to reject personnel proposed by CMS. Specifically, the contract states, "The ADOC reserves the right to reject any CMS personnel . . . . Any such rejections shall not be unreasonably exercised by the ADOC." (Health Services Agreement between the ADOC and CMS, Nov. 1, 2007 ("ADOC-CMS contract") (Ex. 24 to Linton Dep., Sept. 11, 2008 ("Linton Dep. I") (Ex. C to CMS Summ. J. Br.)).) In September 2007, after receiving notification of the ADOC's intent to contract with CMS, CMS set about hiring "approximately 543 individuals." (Linton Aff. ¶ 3.) CMS retains physicians, dentists, and "other medical specialists" as independent contractors, not employees. (Meeker Aff. ¶ 6; Ray Dep. 12.)

Camp submitted his application for a dental position with CMS on October 10, 2007 (Camp application, Oct. 10, 2007 (Ex. 1 to Camp Dep. I)), and interviewed with the state's Dental Director Dr. Mark King ("King") on October 12, 2007. (King Dep. 12, 46 (Ex. E to CMS Summ. J. Br.).) After the interview, King forwarded "a favorable report" of Camp to CMS's Dental Recruiter Christine Ray ("Ray"). (King Dep. 50.) According to Ray, King "approved [Camp] and wanted [her] to move forward with a contract." (Ray Dep. 25.)

On October 15, 2007, Larry Linton ("Linton"), CMS's Regional Vice President, received an email from Ray requesting Linton's permission to extend an offer to Camp. (Ray

Dep. 27; Linton Dep. I 185; email from Ray to Linton, Oct. 15, 2007, 3:29 p.m. (Ex. 21 to

Linton Dep.).)  Two hours before receiving Ray's email, Linton received an email from West

stating:

> I received an e-mail from Mark [King] about a future hire at Limestone –
> Larry Camp.
>
> This is the guy who wrote everyone from the commissioner down to stir up
> trouble for PHS.  I guarantee you he will not work an 8 hour day consistently.
> The Board believed his crap against me.  No one else did!

(Email from West to Linton, Oct. 15, 2007, 1:19 p.m. (Ex. 105 to Linton Dep., Oct. 17, 2008

("Linton Dep. II") (Ex. D to CMS Summ. J. Br.).)  Linton subsequently emailed Naglich,

Ferrell, and Brandon Kinard of the ADOC, asking for their views on Camp: "I heard Dr.

Camp has a history in Alabama.  He wants to work for us at Limestone – any guidance?"

(Email from Linton to Naglich, Ferrell, and Kinard, Oct. 15, 2007, 5:16 p.m. (Ex. 21 to

Linton Dep. II).)  Ferrell, who, having formerly worked with Camp and Martindale at PHS,

had become the ADOC's Medical Systems Administrator (Ferrell Dep. 13 (Ex. M to CMS

Summ. J. Br.)), responded to Linton's email, writing "Absolutely not!" and "This is the one

who had us all before the State Dental Board [w/]r/t Dr. Mike West."  (Email from Ferrell

to Linton, Naglich, and Kinard, Oct. 16, 2007, 8:50 a.m. (Ex. 21 to Linton Dep. I.); email

from Ferrell to Linton, Oct. 16, 2007, 8:55 a.m. (Ex. 21 to Linton Dep. I.).)  When asked for

the basis of her email to Linton, Ferrell testified during her deposition that "Dr. Camp had

an issue with his timekeeping previously; Dr. Camp did not work well with his professional

associates; he did not take instruction well; and Dr. Camp was an independent operator."

(Ferrell Dep. 218 (Ex. 5 to ADOC Defs.' Summ J. Br.).) After receiving Ferrell's emails, Linton requested that Ray "not continue [to] pursue Dr. Camp." (Email from Linton to Ray, Oct. 16, 2007, 10:07 a.m. (Ex. 21 to Linton Dep. I).)

Naglich, the ADOC's Associate Commissioner of Health Services (Naglich Dep. 38 (Ex. L to CMS Summ. J. Br.)), responded to Linton's email on October 26, 2007, stating that it was "[n]ot in our best interest" to hire Camp. (Email from Naglich to Linton, Oct. 26, 2007, 4:31 p.m. (Ex. R to Pls.' Summ. J. Br.).) Subsequently, Linton had a conversation with Naglich, during which Naglich discussed Camp's alleged "time and attendance issues" while employed at PHS. (Linton Dep. I 99, 329, 341-43.) At the time she made the recommendation not to hire Camp, Naglich had never personally worked with or supervised Camp and had no personal knowledge of any complaints filed against him. (Naglich Dep. 20-22 (Ex. D to Pls.' Summ. J. Br.).) She was, however, aware of the letter that Camp had sent to the ADOC commissioner and that a complaint had been filed against Dr. West. (Naglich Dep. 100-101, 104 (Ex. D to Pls.' Summ. J. Br.).) According to Naglich, the basis for her recommendation not to hire Camp was a prior conversation with PHS's chief operating officer, during which Naglich learned that Camp had been terminated by PHS for failure to work the required hours and for "fraudulent reporting of hours." (Naglich Dep. 96-97, 99-100, 178-79 (Ex. L to CMS Summ. J. Br.).) Linton asserts that the final decision regarding Camp's employment was made after hearing from Naglich. (Linton Dep. I 329, 341-43; *see also* Linton Dep. II 114 (Ex. M to Pls.' Summ. J. Br.) ("[I]f the client doesn't

want to hire someone, . . . then we won't hire someone . . . .").)  Ray notified Camp of the decision not to hire him in late October.  (Camp Dep. I 251-52.)

Camp contends that he contacted Allen to report his concerns that the decision not to hire him at the Limestone Facility was in retaliation for his complaint against West.  (Camp Aff. ¶ 25[3]; Naglich Dep. 193 (Ex. D to Pls.' Summ. J. Br.).)  Allen notified Naglich of Camp's allegations (Naglich Dep. 193-94 (Ex. D to Pls.' Summ. J. Br.)), and Naglich responded by stating that she would have the site reviewed and look into any grievances or complaints (Naglich Dep. 194 (Ex. D to Pls.' Summ. J. Br.)).

Upon learning of Camp's complaint to Allen, Linton sent an email to his supervisor stating, "One candidate – Camp – has a history and is not allowed back by ADOC.  This is a good thing as he is bad news administratively.  He thinks nothing of going around us to the commissioner and has recently done so.  Smart commissioner, foolish him."  (Email from Linton to J. M. Courtney, Jan. 5, 2008, 1:20 p.m. (Ex. V to Pls.' Summ. J. Br.).)

### 3.     *Martindale's Application with CMS*

In late October 2007, Martindale interviewed for a dental assistant position with Debbie Hunt Vaughn, the Health Services Administrator at the Limestone Facility.  (Vaughn Dep. 47 (Ex. G to CMS Summ. J. Br.).)  Martindale claims that Vaughn offered her the position during the interview (Martindale Dep. 101); however, Vaughn asserts that she did not have the power to offer Martindale the job at that point because she was not the ultimate

---

[3] The ADOC defendants' motion to strike paragraph 25 of Camp's affidavit is addressed in section (IV)(B)(2)(c)(iii) n. 8, *infra*.

decisionmaker.  (Vaughn Dep. 15-16.)  Further, Vaughn maintains that she could not offer the job "for sure" because she did not know the start date at the time of the interview. (Vaughn Dep. 48, 112.)

The decision not to hire Martindale was made after Linton's conversation with Naglich regarding Camp.  Naglich, who had never worked with Martindale, brought up Martindale's name during this conversation, mentioning that she had also been let go from PHS due to "time and attendance" issues.  (Linton Dep. I 99; Naglich Dep. 26  (Ex. D to Pls.' Summ. J. Br.).)  After this conversation, Linton contacted Vaughn and told her that CMS would not retain Martindale.  (Linton Dep. I 98-99.)

## B.    Procedural Background

Plaintiffs filed their Complaint on March 27, 2008 (Doc. # 2) and an Amended Complaint on November 10, 2008.  (Doc. # 37.) Plaintiffs' Amended Complaint alleges: (1) 42 U.S.C. § 1983 First Amendment retaliation against all Defendants, (2) tortious interference with business and employment relations against the ADOC defendants, (3) fraud against CMS, (4) slander per se against Naglich, (5) the tort of outrage against all Defendants, (6) negligent and/or wanton supervision and retention against CMS, (7) wanton supervision and retention against Naglich, (8) wanton supervision and retention against Allen, and (9) civil conspiracy against CMS, Ferrell, and Naglich.

Plaintiffs moved for summary judgment on Camp's § 1983 claims against all Defendants.[4]  CMS and the ADOC defendants subsequently moved for summary judgment on all Plaintiffs' claims.  (Docs. # 71, 74.)

### III.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by

---

[4] Because CMS's motion for summary judgment on both Camp's and Martindale's claims will be granted, Plaintiffs' motion for summary judgment on Camp's § 1983 claim against CMS will not be reached.  Furthermore, to the extent the ADOC defendants' motion for summary judgment is denied, genuine issues of material fact exist.  Therefore, Plaintiffs' motion for summary judgment on Camp's § 1983 claims against the ADOC defendants is not reached.

showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex Corp.*, 477 U.S. at 324; Fed. R. Civ. P 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Celotex Corp.*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine issue of material fact, the nonmoving party must produce evidence

such that a reasonable trier of fact could return a verdict in his favor).  However, if the evidence on which the nonmoving party relies, "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S.), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment.").  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where

the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV. DISCUSSION

The parties bring cross-motions for summary judgment. Plaintiffs move for summary judgment on Camp's § 1983 First Amendment retaliation claims; CMS and the ADOC defendants move for summary judgment on all Plaintiffs' claims.

**A.      Plaintiffs' § 1983 Claim Against CMS**

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] a suit in equity . . . .

42 U.S.C. § 1983. Thus, to establish a claim under § 1983, Plaintiffs must show: (1) a violation of a constitutional right and (2) that the violation was committed by a person acting under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

Addressed as a threshold matter is CMS's argument that Plaintiffs' § 1983 First Amendment retaliation claim against CMS fails as a matter of law under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

13

In *Monell*, the Supreme Court held that a state actor "cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. at 691. Instead, such liability must be predicated on an official policy or custom. *Id.* at 694. In other words, a government entity may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* The Eleventh Circuit has expanded this notion to include private entities. *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997) ("[T]he *Monell* policy or custom requirement applies in suits against private entities performing functions traditionally within the exclusive prerogative of the state, such as the provision of medical care to inmates."); *see also Harvey v. Harvey*, 949 F.2d 1127, 1129 (11th Cir. 1992) ("*Monell* involved a municipal corporation, but every circuit court to consider the issue has extended the holding to private corporations as well."). Thus, to the extent CMS's liability is based solely on the actions of its employees – specifically, the hiring decisions made by CMS employee Linton – Plaintiffs' § 1983 First Amendment retaliation claim cannot stand. On the other hand, if there exists a genuine issue of material fact as to the existence of an official policy or custom constituting "deliberate indifference" to the constitutional right at issue, or if an official "policymaker's" actions deprived Plaintiffs of their constitutional rights, summary judgment on this basis is inappropriate. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

The Eleventh Circuit has articulated three ways a plaintiff can meet his or her burden under *Monell*. To survive summary judgment, a plaintiff must identify: (1) an official policy, (2) a settled custom, or (3) the actions of a "policymaker" that caused the alleged constitutional violation. *Garvie v. City of Ft. Walton Beach*, 366 F.3d 1186, 1188 (11th Cir. 2004). Plaintiffs allege all three.

According to Plaintiffs, CMS's practice of acquiescing to the ADOC's hiring decisions caused the alleged constitutional violations. (*See* Pls.' Reply 5 (Doc. # 107) ("CMS's policy and custom of blindly following the directives of the ADOC (even where the directives are unlawful), which Linton complied with, renders CMS liable to Dr. Camp under § 1983.").) This "policy and custom" of following the ADOC's directives arises from CMS's contract with the ADOC, which gives the latter ultimate authority to reject candidates for employment. (*See* ADOC-CMS contract ("The ADOC reserves the right to reject any CMS personnel . . . ." ).) Plaintiffs assert that "but for" this policy and custom, CMS would have hired Camp and Martindale. (*See* Pls.' Reply 4.) However, mere causation is insufficient to establish liability under *Monell*. Where the policy or custom in question is constitutional on its face,[5] Plaintiffs must show that the "facially valid action" – *i.e.,* entering

---

[5] There can be no doubt that the`contractual provision at issue here is constitutional on its face. The contract expressly states that the ADOC will not exercise its authority "unreasonably." (ADOC-CMS contract.) Moreover, courts have long-recognized the unique circumstances surrounding prison administration. *Washington v. Harper*, 494 U.S. 210, 223 (1990); *see also Evans v. Stephens*, 407 F.3d 1272, 1289 (11th Cir. 2005) (*en banc*) (Carnes, J., concurring) ("[D]etention facility officials have a legal obligation to ensure, to the extent reasonably feasible, that their facilities are safe not only for those detained but also for those who work there and those who visit."). Safety concerns necessitate oversight with respect to who is hired to work in Alabama prisons.

into a contract that gives the ADOC ultimate hiring authority over medical and dental personnel working in Alabama prisons – was "'taken with "deliberate indifference" as to its known or obvious consequences.'"  *McDowell*, 392 F.3d at 1291 (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989))).

In *McDowell*, the Eleventh Circuit held that the county's violation of a prisoner's constitutional right to medical care was not a "highly predictable consequence" of the county's failure to provide an adequate budget for medical staff.  392 F.3d at 1292.  In reaching this conclusion, the court discussed the lack of evidence identifying a "pattern of injuries."  *Id.* at 1291.  Without evidence of previous violations of federally protected rights, the county "had no notice of the consequences" of its budgetary decision.  *Id.*

As in *McDowell*, the alleged constitutional violation in this case was not a "highly predictable consequence" of the policy at issue – the contractual provision giving the ADOC ultimate hiring authority.  Here, Plaintiffs allege that in agreeing to the aforementioned contractual provision, CMS was "deliberate[ly] indifferent" to the "known or obvious consequences" that the ADOC could direct CMS to act unlawfully.  (*See* Pls.' Reply 4.) However, Plaintiffs point to no evidence of past constitutional violations resulting from the policy decision.  *See McDowell*, 392 F.3d at 1291.  The express language of the contract further undermines Plaintiffs' contention  that CMS had the requisite culpability in entering the contract: The contract expressly limits the ADOC's ability to reject candidates for

16

employment by mandating that "[a]ny such rejections shall not be unreasonably exercised by the ADOC." (ADOC-CMS contract.) Thus, Plaintiffs have failed to meet their burden of showing that there are genuine issues of material fact as to the existence of a policy or custom giving rise to *Monell* liability.

Plaintiffs claim, in the alternative, that CMS should be held liable for the unconstitutional actions of its policymakers. As Plaintiffs contend, liability may also be imposed under *Monell* for the decisions or actions of policymakers within the organization. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("*Monell*'s language makes clear that it expressly envisioned other officials 'whose acts or edicts may fairly be said to represent official policy,' and whose decisions therefore may give rise to municipal liability under § 1983.") (quoting *Monell*, 436 U.S. at 694) (internal citation omitted). However, "liability attaches only where the decisionmaker possesses final authority to establish . . . policy with respect to the action ordered." *Id.* at 481. Whether an official has final policymaking authority is a question of state law. *Id.* at 483.

Plaintiffs claim that Linton is a policymaker under Alabama law because, as the Regional Vice President of CMS, he is in charge of managing the contract with the ADOC, and because his supervisors were not involved in the hiring decisions at issue. (Pls.' Resp. 15-16 (Doc. # 91).)

While Plaintiffs allege that Linton had authority in making hiring decisions, they do not allege that he had authority to determine *policy* with respect to these hiring decisions.

*Monell* liability is predicated on the latter.  While Linton manages the contract, there is no evidence that he was involved in negotiations relating to the contractual provisions at issue; nor is there evidence that  Linton had any authority to establish, or deviate from, employment policy generally at CMS.  Linton's authority to work with the ADOC in making hiring decisions is insufficient to show that he is a "final policymaker" within CMS.

For the foregoing reasons, the court finds that there is no genuine issue of material fact as to whether CMS is liable under *Monell*, and therefore, CMS's motion for summary judgment on Plaintiffs' § 1983 First Amendment retaliation claims is due to be granted.

**B.**      **Plaintiffs' § 1983 Claims Against the ADOC Defendants**

The ADOC defendants contend that they are immune from suit in their individual capacities under the doctrine of qualified immunity.   Qualified immunity protects government officials performing discretionary functions from liability for civil damages, so long as their conduct does not violate "'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 801 (1982).  Before inquiring into the particular constitutional rights at issue, the court must determine whether the officials have met their burden in establishing that "'[they were] acting within the scope of [their] discretionary authority when the allegedly wrongful acts occurred.'" *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  If the court finds that the officials were acting within their discretionary authority, the burden shifts to the plaintiffs to show that the

defendants are not entitled to qualified immunity. *Id.* (citing *Lee*, 284 F.3d at 1194). To meet their burden, Plaintiffs must satisfy both elements of the test laid out in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In *Saucier*, the United States Supreme Court mandated a two-step process for resolving government officials' qualified immunity claims. 533 U.S. at 201. The Court held that the threshold question in qualified immunity cases is whether the facts, taken in the light most favorable to the plaintiff, show the violation of a constitutional right. *Id.* Second, "if a violation could be made out," the court must determine whether the right at issue was "clearly established." *Id.* On reconsidering this stringent two-step process, the Supreme Court in *Pearson v. Callahan* concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." 129 S. Ct. 808, 818 (2009). Instead, judges of the lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

### 1.   *Discretionary Authority*

The first consideration is whether the ADOC defendants met their burden of showing that they were acting within their "discretionary authority" when the alleged constitutional violations occurred. The proper inquiry is twofold: (1) whether the government employee was "performing a legitimate job-related function (that is, pursuing a job-related goal)" and (2) whether the government employee, in pursuit of this legitimate job-related function, used

"means that were within his power to utilize." *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

With respect to Allen, the alleged constitutional violations concern his "ratification" of the hiring decisions and his alleged failure to investigate Camp's complaints. As the Commissioner, Allen heads the ADOC and exerts "independent direction, supervision and control." Ala. Code § 14-1-1.3 (1975). Thus, the hiring decisions and any alleged failure to investigate said hiring decisions fall squarely within Allen's "legitimate job description." *Holloman*, 370 F.3d at 1266. Similarly, the means used in executing these functions, *i.e.*, dispatching subordinates to investigate complaints and otherwise communicating with other ADOC and CMS employees, do not fall outside Allen's discretionary authority. *See id.* at 1267. Accordingly, the court finds that Allen has met his burden of establishing that he was acting within the scope of his discretionary authority when the alleged unconstitutional acts occurred.

Naglich and Ferrell likewise have met their burden. Naglich, as Associate Commissioner of Health Services, is in charge of "every aspect" of the ADOC's health services program. (Allen Dep. 21 (Ex. 3 to ADOC Defs.' Summ. J. Br.).) Ferrell, as the ADOC's Medical Services Administrator, is "part of a team that oversees" the provision of medical and dental services to Alabama state prisons. (Naglich Dep. 35-36 (Ex. 4 to ADOC Defs.' Summ. J. Br.).) Providing recommendations – or as Plaintiffs contend, making the ultimate decision – as to who is and is not hired to work as medical providers in Alabama

20

state prisons – the crux of Plaintiffs' constitutional claims against Naglich and Ferrell – is a "legitimate job-related function." *Holloman*, 370 F.3d at 1266.  By communicating these recommendations and/or hiring decisions to CMS employees, Naglich and Ferrell used the reasonable means at their disposal in executing their legitimate job functions.  *Id.* at 1265.

### 2.    *Constitutional Violation*

The burden then shifts to Plaintiffs, who must show the existence of genuine issues of material fact as to whether the ADOC defendants violated Plaintiffs' constitutional rights. *Saucier*, 533 U.S. at 201.  Because the government has an interest in "promoting the efficiency of the public services it performs through its employees," government employers are afforded more discretion in regulating or prohibiting the speech of their employees. *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563, 568 (1968);   *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007).  A public employer, such as the ADOC, may have important reasons for regulating speech – in the form of an adverse employment action such as termination, failure to promote, or failure to hire – that do not apply in the private citizen context.  Thus, Plaintiffs' burden depends on whether they acted as public employees or private citizens when engaging in the speech at issue.

Plaintiffs assert that their complaints were made while working as employees of a private organization, PHS, and that they should therefore be treated as private citizens for purposes of their First Amendment retaliation claim.  The ADOC defendants, on the other hand, contend that the Supreme Court's decision in *Board of County Commissioners,*

*Wabaunsee County, Kansas v. Umbehr* – equating government contractors to government employees for purposes of First Amendment retaliation claims – requires the court to apply the public employees test.  518 U.S. 668, 678-79 (1996).

The issue in *Umbehr* was "whether, and to what extent, the First Amendment protects independent contractors from the termination of at-will government contracts in retaliation for their exercise of the freedom of speech." *Id.* at 670.  In finding that the public employee test of *Pickering* should apply, the court looked to the "closeness" of the Plaintiff contractor and the government.  *Id.* at 680.  According to the Court, "Independent contractors appear to us to lie somewhere between the case of government employees, who have the closest relationship with the government, and our other unconstitutional conditions precedents, which involve persons with less close relationships with the government." *Id.*  Thus, the relevant inquiry in this case concerns the relationship between Plaintiffs and the state of Alabama.

Plaintiffs had a sufficiently close and dependent relationship with the government such that they should be considered public employees for the purpose of their First Amendment retaliation claims.  Although Plaintiffs were not in a direct contractual relationship with the ADOC, they worked for PHS (an ADOC contractor), they worked in the Alabama state prisons on Alabama state prisoners, and they were subject to the ADOC's hiring decisions.  Furthermore, when asked whether "the rules that apply to providing patient care differ in the correctional setting than in the private setting," Camp testified that the

services, security, scheduling, and administrative procedures differ in a correctional setting. (Camp Dep. I 98-99.)  While they may have received their paychecks from PHS, Plaintiffs clearly worked within the confines of the Alabama prison system.  For these reasons, the court applies the "public employee" test.[6]

To state a retaliation claim,  a public employee must show: 1) "that the speech can be fairly characterized as relating to a matter of public concern, 2) that her interests as a citizen outweigh the interests of the State as an employer, and 3) that the speech played a substantial or motivating role in the government's decision to take an adverse employment action." *Akins v. Fulton*, 420 F.3d 1293, 1303 (11th Cir. 2005).  If the plaintiff establishes the first three elements, the burden "shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech." *Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005).  "The first two steps are questions of law; the final two steps are 'questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech.'" *Id.* (quoting *Anderson v. Burke County, Ga.*, 239 F.3d 1216, 1219-20 (11th Cir. 2001)).

---

[6] To the extent Plaintiffs have met their burden under the public employee test, they necessarily would have met their burden under the less-stringent private employee test.  To state a retaliation claim, a private citizen must only establish: (1) that his or her "speech or act was constitutionally protected"; (2) "that the defendant's retaliatory conduct adversely affected the protected speech"; and (3) "that there is a causal connection between the retaliatory actions and the adverse effect on speech."  *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

### a.     Citizen Speaking on a Matter of Public Concern

The first prong of the public employee test concerns whether the public employee was speaking as a citizen on a matter of public concern. *Akins*, 420 F.3d at 1303. Whether an employee's speech addresses a matter of public concern is determined by the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). "Public concern" is defined as speech that "'relate[s] to a matter of political, social, or other concern to the community.'" *Akins*, 240 F.3d at 1304 (quoting *Watkins v. Bowden*, 105 F.3d 1344, 1352 (11th Cir. 1997)). Because "'an employee's speech will rarely be entirely private or entirely public,'" it is protected so long as the "main thrust" of the speech is on a matter of public concern. *Id.* (quoting *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993)).

The ADOC defendants contend that the real motivation behind Camp's complaints was his dissatisfaction with West's leadership and concern over pay. (ADOC Defs.' Summ. J. Br. 55.) Camp's letter to PHS and the ADOC begins by addressing the "[c]urrent shortcomings in supply, equipment, lab/prosthetic support and personnel [that] are adversely affecting the quality and quantity of dental health care available to the inmate population in the state system." He goes on to describe West's "[f]ailure of leadership," giving specific examples of allegedly unsanitary and brutal practices. Camp then discusses the staff shortages at the Limestone Facility and his unwillingness to accept a pay reduction offered by West. He ends the letter by stating that "[c]urrent dental conditions within [the ADOC]

24

are not conducive to attract and retain quality personnel and I will soon leave if conditions do not change."  (Camp letter (Ex. 1 to Camp Aff. I).)

Camp does, to some extent, incorporate personal employment grievances into his letter; however, the court finds that the "main thrust" of the speech relates to a matter of public concern – the health of Alabama inmates and the public at large.  Both Camp and Martindale raise concerns about the Director of Dental Services' allegedly unsanitary and cruel practices.  Notably, both Camp and Martindale detail West's allege use of unsterilized equipment.  According to the testimony by Dr. Janine Jason, such practices significantly increase the risk of transmitting HIV among prison inmates and the public as a whole.  (*See* Jason Dep. 281-82 (Ex. B to Pls.' Reply Br.) (stating that the risk of HIV transmission "is over 37 times greater" if the guidelines are not followed).)  Certainly, a dentist's alleged failure to comply with the Centers for Disease Control's Recommended Infection-Control Practices is a matter of public concern.  (*See* Dental Board Am. Order (stating that Dr. West was sanctioned for failing to comply with these guidelines); *see also Cook*, 414 F.3d at 1319 ("In various contexts, we have made it clear that speech relating to the safety of the public involves a matter of public concern.").)

This does not end the inquiry, however.  In *Garcetti v. Ceballos*, the Supreme Court limited the constitutional protection afforded government employees by holding that the First Amendment does not protect an employee speaking as part of his or her official job duties.  547 U.S. 410, 423 (2006).  In that case, a deputy district attorney filed a § 1983 claim for

25

First Amendment retaliation, alleging that he suffered an adverse employment action after writing a memorandum that recommended dismissal of a case on the basis of government misconduct. *Id.* at 414-15. The Supreme Court, in a 5-4 opinion, found that Garcetti had acted "pursuant to his duties as a calendar deputy." *Id.* at 421. In writing the memorandum, the deputy district attorney was merely conducting his "daily professional activities" and performing the "tasks he was paid to perform," *id.* at 422, with the result that his speech was not protected.

The ADOC defendants contend that Plaintiffs merely reported that which they had an obligation to report, and, as a result, are not entitled to First Amendment protection under *Garcetti.* The ADOC defendants offer Camp's testimony as evidence that he had an official duty to report misconduct to the Dental Board. (*See* Camp Dep. I 178 (Ex. 1 to ADOC Defs.' Summ. J. Br.) (stating that Camp believed it was his professional obligation as a licensed dentist to report such "egregious" acts to the Dental Board). However, Camp states in his affidavit that he also communicated his concerns to the then-Commissioner of the ADOC, Mr. Donal Campbell ("Campbell"). In fact, Camp sent a carbon copy of the letter to Campbell. (Camp letter (Ex. 1 to Camp Aff. I).) The ADOC defendants offer no evidence of Camp's professional obligation to report such conduct to the ADOC Commissioner. Regarding Martindale's speech, the only evidence that Martindale had a professional obligation to report misconduct to the Dental Board is her deposition testimony in which she states that she *felt* she had an obligation to report misconduct. (Martindale Dep. 210-11 (Ex.

2 to ADOC Defs.' Summ. J. Br.).)  A "feeling" of obligation to report misconduct does not necessarily equate to a "professional duty" to do so.

However, "[t]hat the plaintiffs had no affirmative duty to go outside the formal chain of command . . . does not convert their speech to that of a private citizen." *Akins v. Fulton County, Ga.*, 278 F. App'x 964, 971 (11th Cir. 2008).  As the Supreme Court has held:

> The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description *is neither necessary nor sufficient* to demonstrate that conducting the task is within the scope of the employee's professional duties.

*Garcetti*, 547 U.S. at 424-25 (emphasis added).  Thus, while relevant, the formally adopted policies and procedures are not determinative.  In *Akins*, the plaintiffs, ex-employees in a county's purchasing department, went outside the chain of command to report irregularities in the bidding process. 278 F. App'x at 970-71.  In holding that the plaintiffs spoke as public employees rather than as private citizens, the court noted that the plaintiffs were ultimately concerned with the "in-house procedure," *i.e.*, complying with the departments "basic instructions to bidders."  *Id.* at 971.  Here, on the other hand, Plaintiffs' complaints have more to do with prisoner care than the integrity of company policies.  Thus, Plaintiffs were acting as private citizens when they complained outside the "chain of command."

Moreover, the court is not  convinced that Camp's communications made pursuant to a general policy requiring that dentists report misconduct to PHS and the Dental Board – *i.e.*, "inside the chain of command" – are sufficient to bring Camp's letter and complaint within

the ambit of unprotected speech.  Unlike the plaintiff in *Garcetti*, Camp was not engaged in "daily professional activity" when he made the complaints.  Writing disposition memoranda was part of the job Garcetti "was paid to do"; Camp was hired to provide dental services to Alabama inmates, not issue reports of dental practices.  In articulating the policy behind its new bright-line rule, the Supreme Court in *Garcetti* stated that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen[; i]t simply reflects the exercise of employer control over what the employer itself has commissioned or created."  547 U.S. at 421-22.  The speech at issue in this case does not "owe[] its existence" to Camp's and Martindale's professional obligations; instead, concern over the standard of dental care provided to Alabama inmates appears to be the basis for the speech.  *Cf. Hartwell v. City of Montgomery*, 487 F. Supp. 2d 1313, 1325 (M.D. Ala. 2007) (finding that the plaintiff's complaint was protected under the First Amendment because reporting a co-worker for violating a department tattoo policy was not part of the plaintiff's "official duties").  Thus, Plaintiffs spoke as citizens on a matter of public concern when making the complaints to PHS, the Dental Board, and the ADOC.

### b.  Balancing the Interests of the Citizen and the State

The next determination is whether Plaintiffs' "interests as . . . citizen[s] outweigh the interests of the State as an employer."  *Akins*, 420 F.3d at 1303.  This balance requires that

the court take "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150.

As discussed above, Plaintiffs' interests relate to the health and treatment of Alabama inmates. Protecting those who report government wrongdoing is a "core concern" of the First Amendment. *Akins*, 420 F.3d at 1304. In contrast, the government's interest in preventing this type of speech is low. As the Eleventh Circuit held in *Akins*, speech of this kind "bring[s] the alleged wrongful practices to light and lead[s] to more efficient provision of public services." *Id.* Thus, the court finds that Plaintiffs' interests as citizens in making the complaints outweigh the interests of the government in preventing this type of speech.

### c.     Causation

The third prong of the public employee First Amendment retaliation test requires Plaintiffs to prove that "the speech played a substantial or motivating role in the government's decision to take an adverse employment action." *Akins*, 420 F.3d at 1303. If Plaintiffs establish the first three prongs, the burden shifts to the ADOC defendants to establish that they would have made the same decisions even absent Plaintiffs' protected speech – *i.e.*, their complaints about West. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Cook*, 414 F.3d at 1318. While the first two elements are questions of law, "[t]he third and fourth elements of the . . . test are questions of fact designed to determine whether a retaliatory motive was the legal cause of the challenged

employment decision." *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1564 (11th Cir. 1995).

### i.      Ferrell

Camp's claim against Ferrell rests on several emails between employees of CMS and the ADOC.  After interviewing for the position at CMS with King on October 12, 2007, King forwarded a "favorable report" of Camp to recruiter Ray.  Ray promptly emailed CMS's Regional Vice President Linton for permission to hire Camp.  Linton, having previously received a cautionary email from West, emailed Naglich, Ferrell, and Brandon Kinard of the ADOC, asking for their views on hiring Camp.  Ferrell – who had a history with Camp and Martindale at PHS – responded to Linton's email with two consecutive emails stating, "Absolutely not!" and "This is the one who had us all before the State Dental Board [regarding] Dr. Mike West."  When asked for the basis of her emails to Linton, Ferrell testified during her deposition that in addition to timekeeping issues, Camp "was an independent operator."  Further corroborating a retaliatory motive is Camp's testimony that Ferrell told him that he was terminated from PHS for "failure to follow policies and procedures and *not following [the] chain of command*."  (Camp Dep. I 212.)  This evidence creates a genuine issue of material fact that Camp's protected speech served as the impetus for Ferrell's recommendation not to hire him.

The ADOC defendants claim that Ferrell's email did not *cause* Camp not to be hired. Specifically, the ADOC defendants claim that Ferrell did not have the authority to make final

hiring decisions, and that Linton was aware that only Naglich (or the warden) had this authority.  (*See* Naglich Dep. 152-53 (Ex. L to CMS Summ. J. Br.).)  However, after receiving Ferrell's emails, Linton requested that Ray "not continue [to] pursue Dr. Camp."  Moreover, after receiving Ferrell's email, Linton sent an email to West stating that CMS would not be hiring Camp, and thanked him for the "heads up."  This evidence is sufficient to establish a genuine issue of material fact that Ferrell's email, and thus Camp's speech, was a "substantial or motivating factor" behind the decision not to hire Camp.  Therefore, the ADOC defendants' motion for summary judgment on Camp's retaliation claim against Ferrell is due to be denied on this basis.

Martindale has not provided sufficient evidence to meet her burden under the third prong of the public employee test with respect to her retaliation claim against Ferrell. Ferrell's emails to Linton do not mention Martindale by name.  Plaintiffs contend that the ADOC defendants treated Camp and Martindale "as one," and, therefore, that "the retaliatory motives detailed in the emails above regarding Dr. Camp apply equally to Ms. Martindale." (Pls.' Resp. 13.)  However, even if the court finds a genuine issue of material fact as to the existence of a retaliatory motive, causation is still absent: Martindale must show that the protected speech was a motivating factor in the *decision* not to hire her; however, there is no evidence beyond the relationships of the parties that Ferrell played a part in this decision. Martindale alleges that her offer of employment was "rescinded" after Linton spoke with Naglich – not Ferrell – about Martindale's alleged time issues while working at PHS.

Accordingly, the ADOC defendants' motion for summary judgment on Martindale's § 1983 claim against Ferrell is due to be granted.

### ii.    *Naglich*

Naglich responded to Linton's inquiry about Camp several days after Ferrell, stating that it was "[n]ot in our best interest" to hire Camp.  At the time she made this recommendation, Naglich had never personally worked with or supervised Camp and had no personal knowledge of any complaints filed against him.  She was, however, aware that Camp had complained about the lack of proper supplies and the mistreatment of prisoners, and she had been shown Camp's 2003 letter to the ADOC Commissioner.  Naglich claims that she had information regarding Camp's alleged "time and attendance issues," and that this served as her motivation for the email recommending that CMS not hire Camp.  However, as Plaintiffs contend, the undisputed evidence shows that the ADOC did not object to the hiring of medical personnel with more suspect backgrounds.  In fact, according to Linton, as of the time of his deposition on October 17, 2008, the ADOC had not declined *any* applications other than that of Camp.  (Linton Dep. II 41 (Ex. M to Pls.' Summ. J. Br.).)  The ADOC, and Naglich in particular, did not object to the hiring of another doctor (CMS Answer ¶ 77 (Doc. # 41)) whose medical licence had been revoked by the Virginia Board of Medicine.  (Va. Bd. of Medicine Order (Ex. W to Pls.' Summ. J. Br.).)  This particular doctor had a long history of "unethical and unprofessional conduct," including, among other things, improperly prescribing narcotics, maintaining inappropriate sexual relationships with

patients, unlawfully self-medicating, and failing to maintain adequate records documenting medical treatment.  (Va. Bd. of Medicine Order.)  Thus, while time and attendance issues may have been a factor in Naglich's decision, a reasonable jury could find that this was mere pretext for retaliation, and that Camp's complaints served as a "substantial or motivating factor" for Naglich's email, and, thus, for the final decision not to hire Camp.[7]  The ADOC defendants' motion for summary judgment on Camp's retaliation claim against Naglich is therefore due to be denied on this basis.

The court finds that Martindale has likewise provided sufficient evidence to meet her burden under the third prong of the public employee test with respect to her retaliation claim against Naglich.  Although the above-referenced emails from Naglich do not mention Martindale by name, the evidence suggests that Naglich's statements about Martindale caused the adverse employment action.  Linton testified that Martindale "was offered the position with CMS" and that the offer was rescinded based on Linton's conversation with Naglich.  (Linton Dep. II 106-07 (Ex. M to Pls.' Summ. J. Br.).)  By her own admission, Naglich did not have to "okay" decisions to hire dental assistants.  Thus, by bringing up Martindale, "*sua sponte*" in a conversation about *Camp*, Naglich demonstrated her retaliatory

---

[7]  Plaintiffs claim that Naglich merely "ratified" the decision not to hire Camp.  The ADOC defendants assert that she was the one who actually rejected the application.  The court finds that she played a significant role in the decision not to hire Camp.  Although Linton had already instructed Ray "not to pursue" Camp, Linton asserts that the *final* decision regarding Camp's employment was not made until after he heard from Naglich.

motives against Martindale.  For these reasons, the ADOC defendants' motion for summary

judgment on Martindale's retaliation claim against Naglich is due to be denied.

### iii.    Allen

Plaintiffs do not claim that Allen had any input in the decision not to hire Camp or

Martindale; rather, Plaintiffs contend that Allen failed to investigate claims of retaliation and

that he is liable as a supervisor.  Camp testified in his affidavit that he contacted Allen to

report his concerns that the hiring decision was in retaliation for his complaints against

West.[8]  Allen notified Naglich of Camp's allegations, and Naglich responded by stating that

she would have the site reviewed and look into any grievances or complaints.

---

[8]  The ADOC defendants move to strike this paragraph (paragraph 25) from Camp's affidavit under the "sham affidavit" rule.  (Doc. # 88.)  A "sham affidavit" is one that flatly contradicts previous deposition testimony.  *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "An affidavit may only be disregarded as a sham 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'"  *Id.* at 954 (quoting *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984)).

Here, Camp's affidavit does not "flatly contradict" his deposition testimony.  Camp testified in his deposition that he "explained to [Allen] . . . . that [he] was concerned because [he] had learned that Laura Ferrell was working for AODC [sic] and that it may be a continuation or some form of retaliation given the personalities from [his] past – past experience."  (Camp Dep. 67-68.)  When asked whether he used the word "retaliation," Camp responded that he could not remember the exact word he used in his conversation with Allen.  (Camp Dep. 68.)  Camp later asserted in his affidavit that he contacted Allen to report his concerns that the hiring decision was in retaliation for his complaints against West. (Camp Aff. I ¶ 25.)  That Camp could not remember whether he used the exact word "retaliation" during his deposition does not foreclose the possibility that he used other words that conveyed the same meaning.  "A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence."  *Tippens*, 805 F.2d at 953.  "Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility" and should be resolved by a trier of fact.  *Id.* at 954.  For these reasons, the ADOC defendants' motion to strike paragraph 25 of Camp's affidavit is unpersuasive.

Plaintiffs cite *Lewis v. Smith* to support their contention that Allen is liable as a supervisor. 855 F.2d 736 (11th Cir. 1988). According to *Lewis*, "[s]upervisory liability under section 1983 may be shown by either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions with the violation." *Id.* at 738. Plaintiffs do not present evidence showing that Allen personally participated in the decision not to hire Camp or Martindale; nor do they present evidence of a "causal connection linking" Allen's actions with the hiring decisions. The final decision not to hire Camp was made *before* Camp contacted Allen with his concerns, and Martindale presents no evidence that she ever contacted Allen or that Allen was personally involved in the decision not to hire her. Thus, Plaintiffs have failed to meet their burden on the issue of causation with respect to their retaliation claims against Allen. For these reasons, the ADOC defendants' motion for summary judgment on Camp's and Martindale's retaliation claims against Allen is due to be granted.

### 3. *Clearly Established Constitutional Right*[9]

Having addressed the first part of the *Saucier* test – whether there was a constitutional violation – the final issue is whether the law was "clearly established" at the time of the alleged constitutional violations. 533 U.S. at 199. There can be no serious dispute that the

---

[9] Because the following motions are due to be granted: (1) CMS's motion for summary judgment on both plaintiffs' § 1983 claims, (2) the ADOC defendants' motion for summary judgment on Martindale's § 1983 claims against Ferrell and Allen, and (3) the ADOC defendants' motion for summary judgment on Camp's § 1983 claim against Allen, the issue of whether the law was clearly established is only addressed with respect to Camp's § 1983 claims against Ferrell and Naglich and Martindale's § 1983 claim against Naglich.

law prohibiting state officials from retaliating against employees who engage in protected speech is "clearly established." *See Walker v. Schwalbe*, 112 F.3d 1127, 1133 (11th Cir. 1997) (citing *Pickering*, 391 U.S. 563 and *Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) for the proposition that "in 1991, clearly established law informed reasonable government officials that [the plaintiff] could not be punished for his First Amendment speech").

### 4.    *Eleventh Amendment Immunity*

The ADOC defendants make the additional argument that they are entitled to immunity under the Eleventh Amendment for all claims asserted against them in their official capacities. However, "the Eleventh Amendment does not prohibit a plaintiff from suing state officials in their official capacities for prospective injunctive relief and costs associated with that relief." *Stevens v. Gay*, 864 F.2d 113, 115 (11th Cir. 1989). Therefore, the ADOC defendants' Eleventh Amendment immunity argument fails as to the claims for injunctive relief.

## C.    **State-Law Claims**

### 1.    *Tortious Interference with Business and Employment Relations*

The ADOC defendants move for summary judgment on Camp and Martindale's second cause of action: Tortious interference with Plaintiffs' business and employment relations with CMS. To state a claim for tortious interference, a plaintiff must establish the following elements: "1) the existence of a contract or business relation; 2) the defendant's

knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; and 4) damage to the plaintiff as a result of the defendant's interference." *Pegram v. Hebding*, 667 So. 2d 696, 701 (Ala. 1995). The plaintiff must also demonstrate that the defendant was a "third party" or "stranger" to the contract with which he or she allegedly interfered. *Parsons v. Aaron*, 849 So.2d 932, 946 (Ala. 2002) (internal citations omitted).

Here, the ADOC defendants contend that they were not "strangers" to the alleged contractual relationship, and, thus, cannot be held liable for any interference with said relationship. According to Plaintiffs, CMS's position directly undermines the ADOC defendants' argument. CMS has taken the position that its relationship with the ADOC defendants "is arms-length and strictly that of an independent contractor." (*See* Pls.' Resp. 26 (Doc. # 91) (citing CMS Summ. J. Br. 45-54).) However, Plaintiffs' tortious interference claim falls short in one important respect: The CMS-ADOC contract gives the ADOC express authority to reject any candidate for employment. (*See* ADOC-CMS contract (stating that "[t]he ADOC reserves the right to reject any CMS personnel . . . . Any such rejections shall not be unreasonably exercised by the ADOC").) Thus, as agents of the ADOC, the ADOC defendants were not "strangers" to Plaintiffs' employment relationship with CMS – Plaintiffs' employment had to be approved by both CMS *and* the ADOC. In expressing their views on individual job applicants, the ADOC defendants simply acted pursuant to their contractual relationship with CMS. For these reasons, Plaintiffs' tortious interference claim

cannot stand, and the ADOC defendants' motion for summary judgment is due to be granted on this basis.

**2.    *Fraud/Promissory Fraud***

In Plaintiffs' third cause of action, Martindale asserts a claim of fraud against CMS. (Am. Compl.)  Specifically, Plaintiffs allege that CMS falsely represented that Martindale was hired, and later rescinded the offer of employment (Am. Comp. ¶¶ 60-63, 108; *see also* Martindale Aff. I ¶ 13 (Ex. B to Pls.' Summ. J. Br.) ("I applied for the part-time dental position with CMS on or about October 19, 2007.  That same day I interviewed with Debra Hunt Vaughn at Limestone.  The interview went well and Ms. Vaughn offered me the part-time dental assistant job on the spot.").)  CMS contends that Martindale's claim is actually one for *promissory* fraud, arguing that any alleged promise by CMS was to begin work "within a week." (CMS Summ. J. Br. 55 (Doc. # 71).)

The Alabama Supreme Court distinguished the elements of fraud from the elements of promissory fraud in *Padgett v. Hughes*:

> The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.

535 So. 2d 140, 142 (Ala. 1988).[10]   Thus, the elements of Martindale's claim depend on whether Vaughn, the Health Services Administrator for CMS who interviewed Martindale, actually hired Martindale when she came in for the interview, or whether she merely promised to hire Martindale in the future.

The alleged false representation occurred during Martindale's interview with CMS on October 19, 2007.  According to Martindale, Vaughn informed her "that she was hired" that same day.  Vaughn testified that she did not in fact offer Martindale the job at that point, contending that she could not have offered Martindale the job because she was not "the ultimate decisionmaker." (Vaughn Dep. 15-16, 48, 112.) Further, Vaughn maintains that she could not offer the job "for sure" because she did not know the start date at the time of the interview.  However, when asked during her deposition how she first met Martindale, Vaughn testified to the following: "[Martindale] came in for an interview [with NaphCare], and *I hired her as a dental assistant*." (Vaughn Dep. 23.) From this testimony, a reasonable jury could infer that Vaughn had the authority to hire Martindale to work for NaphCare, and, thus, that she had similar authority to hire Martindale to work for PHS.  The court is not in a position to make credibility determinations.  Thus, genuine issues of material fact exist as to whether Vaughn offered Martindale the job on October 19, 2007, and both factual scenarios (supporting claims for fraud and promissory fraud) are addressed below.

---

[10]  In its motion for summary judgment, CMS proceeds on the assumption that the claim is one for promissory fraud.  In doing so, CMS devotes the entirety of its argument to the last two factors of a promissory fraud claim: intent not to perform and intent to deceive.  Notably, CMS does not dispute the third and fourth elements of Plaintiffs' fraud claim.

On the assumption that Vaughn did in fact hire Martindale on October 19, 2007, and that the claim is one for fraud, the question remains whether the alleged offer of employment was a *false* representation.  Other than the fact that Martindale was not retained to work for CMS, Plaintiffs offer no evidence that Vaughn's initial offer of employment was false. Further undermining the alleged falsity of Vaughn's representations is Vaughn's testimony that she previously hired Martindale to work at Naphcare, showing that such an offer, if made, would not be a false representation.  Moreover, Plaintiffs allege that the decision not to retain Martindale was not made until Linton spoke to Naglich – *after* Martindale's interview with Vaughn.  The Amended Complaint specifically states that "Defendant Naglich requested that Mr. Linton rescind CMS's offer to Ms. Martindale," and that "Mr. Linton complied with Defendant Naglich's request and informed Ms. [Vaughn] that Ms. Martindale's offer needed to be rescinded."  (Am. Compl. ¶¶ 60, 62.)  The allegations of recision tend to disprove Plaintiffs' fraud claim.  If, as Plaintiff's contend in their Amended Complaint, the offer of employment was valid, and that CMS and/or the ADOC *rescinded* the offer after it was made, the cause of action would be one for breach of contract, not fraud. Thus, Plaintiffs's claim for fraud cannot withstand summary judgment.

If, on the other hand, the jury finds that Vaughn did not in fact hire Martindale on October 19, 2007, and that the representation was a promise to hire in the future, the court must consider the whether Vaughn had the requisite intent to deceive Martindale when she made the alleged representation.  The court finds that Plaintiffs have provided insufficient

40

evidence to meet this element of a promissory fraud claim.  "The failure to perform, alone, is not evidence of intent not to perform at the time the promise was made.  If it were, a mere breach of contract would be tantamount to fraud." *Purcell Co., Inc., v. Spriggs Enterprises, Inc.*, 431 So. 2d 515, 519 (Ala. 1983).  For the foregoing reasons, CMS's motion for summary judgment on Martindale's fraud/promissory fraud claim is due to be granted.

### 3.        *Slander Per Se*

Plaintiffs' fourth cause of action alleges slander per se against Naglich.  The alleged defamatory statements concern Naglich's communications to Linton about Camp and Martindale's time and attendance issues while employed with PHS.  Specifically, Plaintiffs claim that Naglich defamed Plaintiffs when she told Linton that they had engaged in fraudulent timekeeping.  The ADOC defendants move for summary judgement, contending: (1) that the alleged defamatory statements were not "published"; (2) that Naglich's communications were made pursuant to a qualified privilege[11]; and (3) that the defense of truth applies.

A defendant is entitled to the affirmative defense of qualified privilege if she can demonstrate that the communication was "prompted by duty owed either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest." *Ex parte Blue Cross & Blue Shield of Ala.*, 773

---

[11] *Ex parte Blue Cross & Blue Shield of Alabama* clarified that the term "qualified privilege" should be used to refer to the affirmative defense that previously had been termed "conditionally privileged."  771 So. 2d 475 (Ala. 2000).

So. 2d 475, 478-79 (Ala. 2000).  The alleged defamatory statements at issue here are ones in which both parties to the communication (the ADOC and CMS) had an interest.  In other words, both the ADOC and CMS had an interest in hiring qualified personnel to work in the Alabama prisons.  Moreover, Naglich, "who is responsible for the administration of medical services to all Alabama prisoners" (Am. Compl. ¶ 68), had a professional obligation to inform CMS of concerns regarding any job applicants.  Naglich is therefore entitled to the defense of qualified privilege.

However, the defense of qualified privilege only defeats a claim of "innocent or mistaken defamation." *Ex parte Blue Cross & Blue Shield of Ala.*, 773 So. 2d at 479.  "A plaintiff cannot prevail against an established defense of qualified privilege unless he has pleaded and proved defamation committed with actual malice."  *Id.*  Actual malice is established with evidence of  "previous ill-will, hostility, threats, rivalry, other actions, former libels or slander, and the like . . . or by the violence of the defendant's language, the mode and extent of the publication, and the like."  *Butler v. Town of Argo*, 871 So. 2d 1, 27 (Ala. 2003) (internal quotations omitted).

Plaintiffs contend that Naglich's statements were made in bad faith, rising to the level of "actual malice."  Specifically, Plaintiffs claim that Naglich had no personal knowledge of Plaintiffs' time records when she spoke to Linton and "that there was no way anyone could know if Dr. Camp's time cards were inaccurate."  (Pls.' Resp. 24 (Doc. # 91).)  To support this proposition, Plaintiffs cite Naglich's deposition testimony, in which she states that the

basis for her statements was a conversation she had with PHS's Chief Operating Officer Dr. Hartman ("Hartman").  According to Naglich, when she inquired as to why Camp had been terminated from PHS, Hartman told her that it had to do with a "failure to comply with the required hours, and fraudulent reporting of hours."  He also mentioned similar problems with dental assistants during this conversation.  Plaintiffs contend that Naglich's lack of personal knowledge – *i.e.*, the fact that she did not personally witness the alleged time and attendance issues – demonstrates her animus toward Camp and Martindale.  Plaintiffs further contend that Naglich brought up Martindale's name "*sua sponte*" during a conversation with Linton "for the sole purpose of slandering her and preventing her from working at Limestone." (Pls.' Resp. 25.)  The court finds that this evidence is insufficient to create a genuine issue of actual malice.

The fact that Naglich received the information regarding Plaintiffs' alleged time and attendance issues second-hand does not demonstrate ill will.  This inquiry is separate from the one discussed in connection with Plaintiffs' First Amendment retaliation claim.  While there was evidence that Camp's speech played a "substantial or motivating role" in the decision not to hire him, there is no evidence that Naglich acted with actual malice – *i.e.*, with reckless disregard for the truth or falsity of the statements uttered – when she reiterated what she heard from Hartman.  In other words, the alleged time and attendance issues may have been simultaneously true *and* pretext for retaliation.  Accordingly, the ADOC

defendants' motion for summary judgment on Plaintiffs' slander claim against Naglich is due to be granted.

### 4.    Tort of Outrage

In their fifth cause of action, Camp and Martindale claim that CMS and the ADOC defendants committed the tort of outrage.  According to the Alabama Supreme Court, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress." *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980). "Extreme and outrageous conduct" refers to "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Nabors v. St. Paul Ins. Co.*, 489 So. 2d 573, 574 (Ala. 1986).  Plaintiffs fail to present evidence sufficient to support a claim for the tort of outrage.

The bulk of Plaintiffs' arguments concerns the harm caused to third parties.  For example, Plaintiffs' complaint refers to inhumane treatment of prisoners, understaffing, cost to taxpayers, the qualifications of medical personnel hired, and the fact that CMS and the ADOC permitted West to continue to provide dental services to Alabama prisoners.  (Am. Compl. ¶ 120).  While certainly alarming, these allegations are irrelevant to Plaintiffs' claim of outrage.  Defendants' decision not to hire Plaintiffs does not rise to the level of "extreme and outrageous" conduct.  *See Newton v. Town of Columbia*, 695 So. 2d 1213, 1218 (Ala.

Civ. App. 1997) ("[W]hile the conduct alleged . . . may amount to an assault, or to a violation of [the plaintiff's] constitutional rights, it does not follow that the same conduct necessarily constitutes extreme and outrageous conduct sufficient to support an action for intentional infliction of emotional distress."). Failing to hire someone in retaliation for protected speech does not "go beyond all possible bounds of decency" such that it should "be regarded as atrocious and utterly intolerable in a civilized society." *Nabors*, 489 So. 2d at 574. If it did, than any claim for First Amendment retaliation could be converted into a tort claim for outrage. The effect this decision had on prisoners or taxpayers does not change the nature of the actions as related to Plaintiffs. Thus, CMS's motion for summary judgment and the ADOC defendants' motion for summary judgment on Plaintiffs' outrage claims are due to be granted.

### 5.   *Negligent and/or Wanton Supervision and Retention*

Plaintiffs allege a claim against CMS for negligent and/or wanton supervision and retention of Linton. Plaintiffs' claim rests on CMS's failure to act in the face of Linton's alleged participation in the retaliation and violation of company policies. Plaintiffs have failed to meet their burden to overcome summary judgment on this claim.

A claim for negligent supervision is, at bottom, a negligence claim. Therefore, Plaintiffs must establish the elements of duty, breach, causation, and injury. The only two elements at issue here are breach and causation.

To satisfy the breach element of a claim for negligent supervision, a plaintiff must present evidence that (1) the employee acted incompetently and (2) the employer had notice of the incompetency but failed to act. *Thompson v. Havard*, 235 So. 2d 853, 858 (Ala. 1970). At a minimum, employee incompetence requires a showing of habitual negligence – negligence alone "is not synonymous with incompetency." *Pritchett v. ICN Med. Alliance, Inc.*, 938 So. 2d 933, 941 (Ala. 2006). To satisfy the notice requirement of the breach element, the plaintiff must show that a specific act of incompetency was "brought to the knowledge of" the employer, or that the incompetency was "of such nature, character, and frequency" that an employer exercising due care would be on notice. *Thompson*, 235 So. 2d at 858.

Linton's conduct serves as the basis for Plaintiffs' claim against CMS. Plaintiffs attempt to demonstrate Linton's incompetency with three pieces of evidence: (1) the email chain with West, allegedly showing a "pattern of sharing confidential information" in violation of CMS's policies; (2) the email to CMS's Dental Recruiter instructing her not to pursue Camp; and (3) the email to CMS's Vice-President of Operations, J. M. Courtney, in which Linton wrote "Camp – has a history and is not allowed back by the ADOC. This is a good thing as he is bad news administratively. He thinks nothing of going around us to the commissioner and has recently done so. Smart commissioner, foolish him." The court addresses each piece of evidence in turn.

Linton's communications with West concerning potential hires do not rise to the level of incompetency.  The emails to which Plaintiffs refer consist predominately of West's recommendations to Linton.  Plaintiffs do not argue that receiving emails of this nature constitutes incompetency.  Rather, they claim that Linton violated company policy by disclosing confidential information in an email to West in which Linton informed West that CMS would not be hiring Camp.  Even if this did constitute a violation of CMS's policy, Camp sent the email *after* the decision not to hire Camp was made, and, therefore, it could not have put CMS on notice of any wrongdoing.

Similarly, the email instructing Vaughn not to pursue Camp does not constitute incompetency.  The ADOC had authority to deny job applicants; Ferrell indicated that the ADOC was exercising this authority with respect to Camp; and Linton simply followed through with these instructions.

Plaintiffs claim that the last email – in which Linton references Camp's history of "going around the commissioner" – put CMS on notice of the retaliatory conduct.  Viewing the evidence in the light most favorable to Plaintiffs, a jury could find that this email demonstrates a retaliatory motive, *i.e.*, that Camp's complaints served as a basis for the decision not to hire him.  However, this email was sent after the fact, and Plaintiffs fail to show how it put CMS on notice of employee incompetency before the alleged injury, *i.e.*, the failure to hire Camp and Martindale.  In other words, Plaintiffs cannot show how this email *caused* their injury.  Plaintiffs claim that CMS failed to take remedial measures upon

47

receiving this email, but there is no evidence that CMS could have done so.  The ADOC exercised its discretion not to hire Plaintiffs, and Plaintiffs do not provide any evidence that CMS could have overridden this decision after the fact.  For these reasons, Plaintiffs' negligent supervision claim against CMS fails and CMS's motion for summary judgment on this basis is due to be granted.

### 6.     *Wanton Supervision and Retention Against Naglich and Allen*

Plaintiffs' complaint alleges that Naglich and Allen "wantonly supervised" their subordinates by "permitting, or failing to prevent" the alleged retaliatory hiring decision. (Am. Compl.)  Plaintiffs point to no evidence demonstrating that either Allen's or Naglich's alleged wanton supervision caused the adverse employment action.  Rather, Plaintiffs devote the bulk of their argument to Allen's and Naglich's alleged failure to investigate the hiring decision *after* the denial of Camp's application.  Specifically, Camp alleges that Allen and Naglich did not investigate the reasons why his application was rejected, and that if they had, they could have remedied the alleged retaliatory conduct.

Even if Plaintiffs could sustain an action for wanton supervision for failure to remedy the injury after it occurred, Plaintiffs have not met their burden of showing that Allen's and Naglich's conduct was "wanton" in this case.  The Alabama Supreme Court has defined "wantonness" as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result."  *Pritchett*, 938 So. 2d at 941.

48

Plaintiffs do not present evidence that Allen or Naglich failed to act while "being conscious that . . . injury [would] likely or probably result." *Pritchett*, 938 So. 2d at 941. The undisputed evidence establishes that Camp contacted Allen with "concerns" after the hiring decision was made; Allen communicated Camp's concern to Naglich; and Naglich conducted an investigation.  Specifically, Naglich testified that Allen informed her that "Dr. Camp had . . . a great deal of allegations concerning the dental care at Limestone [and] spoke of inmates being mistreated and infection." (Naglich Dep. 193-94 (Ex. D to Pls.' Summ. J. Br.).)  According to Naglich, she told Allen that she would "have the site reviewed and look at . . . any grievances or complaints." (Naglich Dep. 194 (Ex. D to Pls.' Summ. J. Br.).) Naglich further testified that she conducted an investigation and reported back to Allen that "there weren't an abnormal amount of grievances; there was no backlog at that point in time; CMS did not have a full-time dentist, but was providing dental hours." (Naglich Dep. 194 (Ex. D to Pls.' Summ. J. Br.).)  She also stated that "if there's an accusation, we look at it." (Naglich Dep. 195 (Ex. D to Pls.' Summ. J. Br.).)  Allen and Naglich acted upon Camp's concerns.  That they did not investigate as thoroughly as Camp would like does not constitute "wanton" conduct.

For these reasons, the ADOC defendants' motion for summary judgment on Plaintiffs' wanton supervision claims against Allen and Naglich is due to be granted.

### 7.   *Civil Conspiracy*

Plaintiffs allege civil conspiracy against CMS, Naglich, and Ferrell.  Civil conspiracy requires "a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." *Keith v. Witt Auto Sales, Inc.*, 578 So. 2d 1269, 1274 (Ala. 1991).  "The gist of the action is not the conspiracy alleged, but the wrong committed." *Sadie v. Martin*, 468 So. 2d 162, 165 (Ala. 1985).  Thus, if the underlying wrong provides no cause of action, then neither does the conspiracy.  A violation of §1983 can serve as the underlying wrong in a civil conspiracy claim.  *See Boone v. Mingus*, 697 F. Supp. 1577, 1582 (S.D. Ala. 1988).

Because CMS cannot be held vicariously liable for the acts of Linton under of §1983, there is no "actionable wrong" in which CMS participated with Naglich and Ferrell.  Furthermore, even if CMS could be held liable for Linton's acts in concert with Naglich and Ferrell, the evidence establishes that CMS did not have the authority to ignore the ADOC's hiring decisions under the ADOC-CMS contract.   Representatives of the ADOC made the decision not to retain Camp and Martindale; if they conspired to "accomplish an unlawful end," they did so among themselves.  Thus, CMS's motion for summary judgment on this claim is due to be granted.

Plaintiffs have, on the other hand, presented sufficient evidence to survive summary judgment on their civil conspiracy claim against Naglich and Ferrell.  According to the Alabama Supreme Court, "The existence of the conspiracy must often be inferentially and

50

circumstantially derived from the character of the acts done, the relation of the parties, and other facts and circumstances suggestive of concerted action." *O'Dell v. State of Alabama ex. rel. John Patterson*, 117 So. 2d 164, 168 (Ala. 1960). Here, Plaintiffs present evidence that both Ferrell and Naglich worked for the ADOC at the time of the alleged retaliatory action and that both Ferrell and Naglich were aware of Camp's and Martindale's protected speech at the time their applications with CMS were denied. Although Ferrell did not expressly instruct Linton not to pursue Martindale, "[i]t is not an essential element of the claim that a particular conspirator commit an overt act in furtherance of the conspiracy." *Huckleberry v. M. C. Dixon Lumber Co.*, 503 So. 2d 1209, 1210-11 (Ala. 1987). A reasonable jury could infer from the "character of the acts done [and] the relation of the parties" that both Naglich and Ferrell conspired to deny Plaintiffs a job opportunity in retaliation for Plaintiffs' prior speech. Thus, the court finds that the ADOC defendants' motion for summary judgment on this claim is due to be denied.[12]

---

[12] The ADOC defendants claim that they are entitled to state agent immunity under Alabama law. The Alabama Constitution "prohibits actions against state officers in their official capacities when those actions are, in effect, actions against the State." *Haley v. Barbour County*, 885 So. 2d 783, 788 (Ala. 2003) (internal citations omitted). However, the ADOC defendants can be divested of state agent immunity upon a showing that they acted "willfully, maliciously, fraudulently, in bad faith, beyond [their] authority, or under a mistaken interpretation of the law." *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). To the extent Ferrell and Naglich conspired to retaliate against Martindale and/or Camp because of their protected speech, a reasonable jury could find that they did so willfully or in bad faith. In other words, Plaintiffs have presented sufficient evidence – including the relationships of the parties and the communications between the parties, as discussed in connection with Plaintiffs § 1983 and conspiracy claims – to create a genuine issue of material fact that Ferrell and Naglich acted willfully or in bad faith when they allegedly conspired to retaliate against Plaintiffs. Thus, state agent immunity does not defeat Plaintiffs' civil conspiracy claim at the summary judgment stage.

**V.  CONCLUSION**

Accordingly, it is ORDERED that:

(1)     Plaintiffs' motion for summary judgment (Doc. # 69) is DENIED.

(2)     CMS's motion for summary judgment (Doc. # 70) is GRANTED.

(3)     The ADOC defendants' motion for summary judgment (Doc. # 73) is GRANTED as to both Plaintiffs' § 1983 First Amendment retaliation claim against Allen, GRANTED as to Martindale's § 1983 First Amendment retaliation claim against Ferrell, DENIED as to Martindale's § 1983 First Amendment retaliation claim against Naglich, DENIED as to Camp's § 1983 First Amendment retaliation claim against Ferrell and Naglich, GRANTED as to Plaintiffs' tortious interference with business and employment relations claim against all the ADOC defendants, GRANTED as to both Plaintiffs' slander per se claim against Naglich, GRANTED as to both Plaintiffs' tort of outrage claim against all the ADOC defendants, GRANTED as to both Plaintiffs' wanton supervision claim against Allen and Naglich, and DENIED as to both Plaintiffs' civil conspiracy claim against Ferrell and Naglich.

Therefore, surviving in this action are the following claims:

(1) Camp's § 1983 First Amendment retaliation claim against Ferrell and Naglich;

(2) Martindale's § 1983 First Amendment retaliation claim against Naglich; and

(3) Both Plaintiffs' civil conspiracy claim against Ferrell and Naglich.

DONE this 22nd day of October, 2009.

_____/s/   W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE